IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

PERRY MILICHEV,                          :              Case No. 5:11 CV 0760

       Plaintiff,                      :

v.                                       :

COMMISSIONER OF SOCIAL SECURITY, :              MEMORANDUM DECISION AND ORDER.
       Defendant.                      :

## I. INTRODUCTION.

In accordance with the provision of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties in this case have voluntarily consented to have the undersigned Magistrate Judge conduct all proceedings in the case and enter a final judgment. In this lawsuit filed pursuant to 42 U. S. C. §§ 405(g), 1383, Plaintiff seeks judicial review of Defendant's final determination denying his claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. The issues before the Court are presented in cross-Briefs on the Merits (Docket Nos. 18 & 19). For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND IN THE FIRST CASE.

While residing in Houston, Texas, Plaintiff filed two applications for benefits, one for SSI on May 6, 2003 and the other for DIB on June 3, 2003. Each application alleged that Plaintiff had been disabled since November 1, 2002 (Tr. 47; 92-94). Following initial and reconsideration denials of his claims, Plaintiff requested a hearing. During the pendency of his case, Plaintiff moved to Ohio. An administrative hearing was conducted on October 4, 2005, in Cleveland, Ohio, and on October 28, 2005, Administrative Law Judge (ALJ) Patrick G. Lazzaro determined that Plaintiff was neither entitled to a period of disability nor eligible for SSI (Tr. 47-53, 60-69). The Appeals Council denied Plaintiff's request for review on April 4, 2006 (Tr. 190-191).

### 1. THE ADMINISTRATIVE HEARING.

At the administrative hearing convened on October 4, 2005 in Cleveland, Ohio, Plaintiff, represented by counsel, and his sister testified.

#### A. PLAINTIFF'S TESTIMONY.

Plaintiff, a 53-year-old widower who relocated to Kenmore, Ohio, was 5'11" tall and weighed 235 pounds. Although he described his memory as being sluggish in comparison to earlier years, Plaintiff had completed two years of college. As a source of support, Plaintiff received food stamp and had a medicaid card. He owned a Toyota pickup which was encumbered (Tr. 486, 487, 488, 489, 490, 502). His sister drove him to the hearing in Cleveland because driving in heaving traffic and in an unfamiliar area precipitated dizziness and confusion (Tr. 495).

Plaintiff was employed in some capacity of bouncer/manager since 1983 and his last job in a nightclub ended in November 2004. Plaintiff had been a technician for Coca Cola in Southeast Alaska. He worked there for six to seven months before he became gravely ill (Tr. 494, 495).

2

Since relocating from Alaska, Plaintiff refrained from searching for employment since he was not certain if he could find work suitable for his experience and skills.  Moreover, Plaintiff opined that a workplace would not accommodate his disabilities--difficulty breathing, dizziness, hand tremors and depression.  Plaintiff speculated that the difficulty breathing and dizziness could have been a side effect of his medication or the result of compression by his large chest, neck and shoulders on his thoracic cavity.  He noted that bouts of dizziness were intensified by hypertensive crisis and occasional fainting episodes and the nature of his depression lent itself to episodes of violent, risky behavior and suicidal ideations.  Plaintiff claimed that his anger emanated from feelings of worthlessness, frustration, negativity and no sense of belonging.  He tended to isolate himself and avoided crowds of more than ten people.  Plaintiff had difficulty requesting help and he did not respond well to criticism (Tr. 488-489, 495-498, 503-505; www.effexor.com).

In June 2005, Plaintiff presented to Portage Path, a comprehensive behavioral health care provider, and requested treatment of deep emotional pain and physical pain which included symptoms of heaviness in his legs, dizziness, migraine headaches and body stiffening and tightness.  Plaintiff attributed the pain, in part, to negative thoughts (Tr. 498, 499; www.portagepath.org/).  He was treated by a team of physicians including a psychologist and several nurses who assisted him navigate treatment.  Plaintiff participated in group therapy once weekly and psychoanalysis as needed (Tr. 500).  Additional therapeutic treatment included taking Effexor, a medication prescribed to treat major depressive disorder and Xanax, a medication used to treat anxiety and panic disorder.  These medications in combination with each other were effective in controlling symptoms of anxiety and depression.  Plaintiff feared that under the influence of these medications, the symptoms of depression would relieve themselves and anxiety would take control, causing a relapse or a cross

over to bipolar activity (Tr. 501-502; www.xanax.com).

Generally, Plaintiff retired between 9 and 10 P.M., slept on the couch until 7:30 A.M. and then had coffee rather than breakfast.  Plaintiff was able to wash and dress himself.  He watched television two hours daily, occasionally vacuumed, swept, dusted and washed dishes and cooked using a microwave oven.  He persuaded others to do his laundry (Tr. 490, 492).  Plaintiff had no hobbies and he went to the movies four to six times annually.  Plaintiff ate out once per week (Tr. 491).  Plaintiff claimed that he left his home only to keep medical appointments and to visit his mother (Tr. 492).  Recently, he had spent time reading about God and religion and completing small chores (Tr. 504).

With respect to his functional capacities, Plaintiff had difficulty sitting still more than five consecutive minutes.  Plaintiff estimated that he could lift twenty pounds but he could not climb more than two flights of stairs without experiencing labored breathing (Tr. 505).

      **B.**    **WITNESS TESTIMONY**.

Plaintiff's sister attested to his bouts of violent behavior that started when Plaintiff was a child and carried over into adulthood.  She was aware that Plaintiff had gone through periods of depression for several years and that he was an angry individual (Tr. 507).  Plaintiff's sister suggested that Plaintiff's problems were, in part, the result of a controlling mother.  His sister expressed concern that Plaintiff had both suicidal and homicidal tendencies (Tr. 508).

      **2.**    **THE ALJ'S FINDINGS**.

Having considered the testimony of the witnesses and medical evidence, ALJ Lazzaro found on October 28, 2005, that:

(1)    Plaintiff met the disability insured status from November 1, 2002 through March 31, 2007, that he had not engaged in substantial gainful activity from November 1, 2002

4

through August 24, 2003 or from January 25, 2004 through at least the date of the decision (October 28, 2005) and Plaintiff did engage in substantial gainful employment from August 25, 2003 through January 24, 2004.

(2)     Plaintiff suffered from major depressive disorder and hypertensive cardiac disease, each of which are severe impairments; however, Plaintiff did not have an impairment, either individually or in combination, that met or equaled the Listing of impairments in Appendix 1, Subpt. P, 20 C. F. R. Part 404.

(3)     Plaintiff retained the residual functional capacity to do a range of light work with the restriction of not climbing ladders, ropes, or scaffolds and avoidance of unprotected heights.

(4)     Plaintiff's medically determinable impairments did not prevent him from performing past relevant work; specifically, his past relevant work as a day manager did not require the performance of work related activities precluded by his residual functional capacity.

(5)     Plaintiff was not entitled to a period of disability and DIB and Plaintiff is not eligible for SSI.

(Tr. 52-53).

**3.     APPELLATE REVIEW.**

Plaintiff did not appeal the ALJ's decision to the Appeals Council.  Neither did he seek judicial review.  The decision of the ALJ is *res judicata* with respect to the same parties on the same facts pertinent to the same issues.

### III. PROCEDURAL BACKGROUND IN THE SECOND CASE.

Plaintiff filed two applications for benefits, one for SSI on January 17, 2006 and one for DIB on July 19, 2007, in Barberton, Ohio (Tr. 205-206 & 417-419).  These applications, too, alleged an onset disability date of November 1, 2002.  Plaintiff's claims of disability are based on diagnoses of essential hypertension, affective disorders, anxiety related disorders, obesity and hyperalimentation (administration or consumption of nutrients beyond minimum normal requirements, in an attempt to replace nutritional deficiencies) (Tr. 188, 420; STEDMAN'S MEDICAL DICTIONARY 190870 (27th ed.

2000)).  Both applications were denied initially and upon reconsideration (Tr. 194-196; 198-199; 421-423; and 425-427).  Plaintiff appeared at a hearing, represented by counsel, on October 22, 2008, before ALJ Mark M. Carissimi.  At the hearing, Plaintiff amended his alleged onset date to October 29, 2005, the day after the ALJ's decision in his prior claim (Tr. 449)  On January 13, 2009, ALJ Carissimi determined that Plaintiff was not disabled under either SSI or DIB standards (Tr. 22-31).

1.      THE ADMINISTRATIVE HEARING.

On October 22, 2009, the ALJ and Plaintiff's counsel elicited testimony from Plaintiff and Evelyn Sindelar, a certified case manager, licensed social worker and vocational expert (VE).

        A.      PLAINTIFF'S TESTIMONY.

Plaintiff reaffirmed that he was born October 5, 1952 and that he had received an associate degree in liberal arts.  Although sometimes dyslexic, Plaintiff was a  pursuing a Bachelor's Degree in history at the University of Akron.  His grade point average was 3.7 (Tr. 450, 473, 474).

At this hearing, Plaintiff detailed his past relevant work as a clerk, bouncer, driver, maintenance personnel and manager and the duties assigned to each position.  As a summer clerk at Cash America Pawnshop, Plaintiff stored pawned items in a warehouse and filed the attendant paperwork.  Generally the job was performed while standing; however, Plaintiff had to lift and carry to storage, small appliances.   Plaintiff earned about $1,800 in wage from this job (Tr. 450-452).

Plaintiff claimed that he worked for Market Day Corporation, a community based fund-raising operation with a mission to raise funds for education.  There, he drove from Houston to San Antonio, to deliver food to churches and schools.  He was also instrumental in the loading of the goods, occasionally lifting four to five boxes simultaneously.  During this six-month period of employment, Plaintiff earned $4,100 (Tr. 452-454; www. MarketDay.com).

For Hartman Management, Plaintiff performed general maintenance on commercial real

estate, including cleaning, mowing the grass and moving furniture that could weigh at least 100 pounds. In addition, Plaintiff performed minor electrical and plumbing repairs (Tr. 454-455).

Turning to his employment at K & P Health Care, Plaintiff was delivered and moved equipment that weighed at least fifty pounds.

Plaintiff micro-managed several clubs and/or restaurants. His duties included supervising personnel, making staff recommendations, ordering supplies, bringing in the liquor and subduing intoxicated patrons as needed. The job was performed while walking; minimal sitting was involved (Tr. 456-460).

Finally, Plaintiff was employed at Odom Corporation as maintenance personnel. There he repaired machines. He was required at any given time to lift up to 75 pounds (Tr. 461-462).

Plaintiff attributed his lack of long-term employment to health and medical deficiencies. After being diagnosed with depression in 1985, Plaintiff's days and nights were characterized by sleep disturbances and atypical days. The medication used to treat depression relieved the symptoms leading up to the onset of anxiety. When he complained to his physicians, his medications were changed and a new level of anxiety and depression commenced. The combination of anxiety and depression affected his work performance (Tr. 464-465, 478).

A patient advocate had worked with the Akron Metropolitan Housing Authority to procure housing for Plaintiff. The patient advocate also provided transportation to medical appointments. Consequently, Plaintiff saw his psychologist, psychiatrist and counselor on the same day, every two to three months (Tr. 467, 471). Since he had no insurance or finances to pay for medical or mental health services, Plaintiff saw a counselor at the counselor's convenience (Tr. 468).

Since the first hearing, Plaintiff's drug therapy had changed. He was now prescribed

Adderall®, an amphetamine used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder, short attention span disorder and impulsivity, and Cymbalta®, a medication used to treat depression and generalized anxiety disorders (Tr. 465-467; PHYSICIANS' DESK REFERENCE, 2005 WL 4061674; 2005 WL 4061862 (Thomson PDR 2005)).

Since the last hearing, Plaintiff had developed cervical disk problems/herniated nucleus pulposus (a slipped disk), persistent muscular pain and a loss of sensation in two fingers.  In addition, he suffered from heart palpitations.  The cervical disc /herniated nucleus pulposus impairments were attributed to a history of heavy lifting (Tr. 470-471; www.ncbi.nlm.nih.gov; wiki.answers.com).

Plaintiff estimated that he could lift a gallon of milk (8.6 pounds) but he could not lift thirty pounds.  He had a driver's license but he no longer had a car.  He could drive locally but he would not to drive from Barberton, Ohio, to greater Cleveland, a forty-five minute drive.  Plaintiff did not cook; he continued to use the microwave to prepare meals by Stouffers® (Tr. 472-473; http://answers.google.com; www.distancebetweencities.net).

     B.     THE VE'S TESTIMONY.

Assessing Plaintiff's past work, the VE organized and categorized it as follows:

| Job | Exertional level at which Plaintiff performed the work | Skill level | Specific vocational preparation (SVP) |
|---|---|---|---|
| Pawnshop clerk | The regulations define **medium work** as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. | Semiskilled work is work which needs some skills but does not require doing the more complex work duties. . . . may require alertness and close attention to watching, inspecting, testing, tending or other types of activities which are similarly less complex than skilled work . . . | SVP of 3 means vocational preparation that exceeds one month up to and including three months. |
| Market Day Clerk | The regulations define **heavy work** as work involving lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. | | SVP of 2 denotes anything beyond a short demonstration up to and including one month. |

8

| Apartment manager | "Very heavy exertional level" | Unskilled work is work that requires little or no judgment to do simple duties that can be learned on the job in a short period of time. | SVP of 2 |
|---|---|---|---|
| Medical deliverer | Heavy exertional level | Semiskilled | SVP OF 3 |
| Maintenance | Heavy exertional level | | SVP OF 2 |
| Bouncer | Very heavy exertional level | Semiskilled | SVP OF 3 |
| Club manager | The regulations define **light work** as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a job is in this category when it requires a good deal of walking or standing, sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; | Skilled | |

(Tr. 476-477)

Considering whether an individual of Plaintiff's age, educational background and medium level of exertional ability could perform Plaintiff's past relevant work, the ALJ included the following functional limitations in a hypothetical question posed to the VE:

- Lift and/or carry 50 pounds occasionally;
- Lift and/or carry 25 pounds frequently;
- Stand and walk six hours out of an eight-hour workday;
- Sit at least six hours out of an eight-hour workday;
- Push or pull up to 50 pounds occasionally and 25 pounds frequently;
- Refrain from climbing ladders, ropes or scaffolds;
- Refrain from working at unprotected heights;
- Refrain from engaging in commercial driving;
- Perform simple, routine work; and
- Have a superficial interaction with co-workers and the public without negotiation or confrontation.

The VE's response was that the hypothetical person could perform the pawnshop clerk position on a part-time basis.  However, there were other jobs in the nation's economy that the hypothetical worker could perform, all with an SVP of 2:

| Job | Dictionary of Occupational Titles (DOT) Designation | Exertional level | Numbers of jobs in NE Ohio/State of Ohio/United States |
|---|---|---|---|
| Dishwasher | 318.687-010 | Medium | 3,965/18,000/ 393,586 |
| Kitchen Helper | 318.687-010 | Medium | 3,965/18,000/393,586 |
| Food Assembler | 319.484-010 | Medium | 1,730/8,400/147,027 |
| Bus Person | 311.677-018 | Medium | 1,900/12,200/ 218,298 |

(Tr. 478-480).

The ALJ asked the VE to consider a person with the same characteristics but because of difficulties with concentration and anxiety, 20% of any given day could result in the hypothetical person's inability to perform assigned duties.  According to the VE, there would be no competitive employment that such individual could perform (Tr. 481).

**2.      THE ALJ'S FINDINGS.**

After careful consideration, the ALJ found:

1.  Plaintiff met the insured status requirements of the Act through March 31, 2008.  He had not engaged in substantial gainful activity since October 29, 2005, the alleged onset date of impairment.

2.  Plaintiff had severe impairments such as hypertension, major depressive disorder, generalized anxiety disorder and personality disorder.  However, Plaintiff did not have an impairment or combination of impairments that met or equaled of the listed impairments.

3.  Plaintiff had the residual functional capacity to perform medium work as followst:

    •   Lift, carry, push and pull up to 25 pounds frequently and fifty pounds occasionally;
    •   Sit up to six hours in an eight-hour workday;
    •   Stand and walk up to six hours in an eight-hour work day;
    •   Perform no more than simple routine work involving nor more than superficial interaction with coworkers and the public without negotiation or confrontation;
    •   Refrain from exposure to unprotected heights;
    •   Refrain from performing commercial driving; and
    •   Refrain from climbing ladders, ropes and scaffolds.

4.  Plaintiff did not have the residual functional capacity to perform his past relevant work

10

but there were jobs that exist in significant numbers in the national economy that a person of Plaintiff's age, education, work experience and residual functional capacity can perform.

    5.  Plaintiff was not under a disability as defined under the Act.

(Tr. 22-31).

3.  **APPELLATE REVIEW**.

On March 11, 2011, the Appeals Council declined review of Plaintiff's claims (Tr. 10-12). Plaintiff filed a timely request for judicial review (Docket No. 1).

## IV.  PLAINTIFF'S EDUCATIONAL BACKGROUND.

Plaintiff's intelligence quotient (IQ) was 115 during his seventh grade year.  On the Weschler Intelligence Scale (WIS), this score classifies as "bright normal intelligence."  Results from the California Achievement Test® (CAT), a test used to evaluate the basic academic skills of children from kindergarten through grade 12, showed that in the seventh grade, Plaintiff read on an 8.2 grade level; he performed math at a 6.3 grade level and his language skills were on at a 6.3 grate level (Tr. 278; www.familylearning.org/tests_cat.php; www.kids-iq-tests.com/iqsocres/115.html).

Plaintiff's IQ scored decreased to 114 during his eighth grade year.  A WIS score of 114 is also classified as bright normal intelligence.  Results from the CAT showed that Plaintiff read on an eighth grade level, his math performance was on a 7.8 grade level and his language skills were performed at a 7.4 grade level.  Graduating in June 9, 1970, Plaintiff's performance was average and when compared with other students, he was ranked in the lower 33% of his class (Tr. 276, 278; www.kids-iq-tests.com/iqscores/114.html).

## V.  PSYCHOLOGICAL TESTING/TREATMENT EVIDENCE.

Plaintiff had a history of symptoms consistent with major depressive disorder, generalized

anxiety disorder and personality disorder.  The evaluations that define the extent of his inability to function normally because of mental incapacity, follow.

1.      **DR. RANDOLPH K. HODGES, M. S.**

Dr. Hodges, M. S., conducted a psychological/psychiatric evaluation on January 13, 1997 and determined that Plaintiff suffered from major depression and dystonia, abnormal tonicity in any of the tissues resulting in impairment of voluntary movement (Tr. 168-169; STEDMAN'S MEDICAL DICTIONARY 122500 (27th ed. 2000).  There is no evidence that Dr. Hodge provided treatment.

2.      **DR. PHILIP P. SCOZZARO, PH. D, LICENSED PSYCHOLOGIST**

Dr. Scozzaro treated Plaintiff from June 21, 2005 through February 9, 2006 (Tr. 318, 320, 323). On March 13, 2006, he provided a summary description of Plaintiff's mental status:

- Normal flow of conversation and speech;
- Mild/moderate depression and anxiety;
- History of anxiety;
- No thinking disorders;
- Alert and oriented;
- No major deficits in cognitive functioning;
- Average ability to remember, understand and follow directions;
- Average ability to maintain attention; and
- Average ability to sustain concentration, persist at tasks and complete them in a timely fashion;

(Tr. 318-319).

In March 2008, Dr. Scozzaro rated Plaintiff's ability to perform the following basic mental activities on a sustained basis.  It was his opinion that:

- Plaintiff had a **poor or no** useful ability to:  (1) function in a competitive setting as it related to dealing with work stresses; (2) complete a normal workday without interruptions for psychologically based symptoms; and (3) leave home on his own.

- Plaintiff had a **fair** ability to: (1) maintain attention and concentration for extended periods of two-hour segments, (2) respond appropriately to changes in a routine setting; (3) deal with the public; (4) relate to co-workers; (5) interact with supervisors; (6) function

independently without special supervision; (7) work in coordination with or proximity to others without being unduly distracted or distracting; (8) understand, remember and carry out complex job instructions; (9) understand, remember and carry out detailed but not complex job instructions; and (10) socialize, behave in an emotionally stable manner, and related predictably in social situations.

- Plaintiff had a **good** ability to: (1) follow work rules; (2) use judgment; (3) maintain regular attendance and be punctual within customary tolerances; (4) maintain appearance and manage funds/schedules (Tr. 370, 377-378).

3.    DR. SCOTT SCHMITT, M. D., PSYCHIATRIST.

Dr. Schmitt performed a psychiatric evaluation on June 27, 2005, and identified Plaintiff's problems as major depressive disorder, intermittent explosive disorder, hypertension, unspecified heart valve problems and recurrent headaches. Assessing Plaintiff's global assessment of functioning, the numeric score used by mental health clinicians to subjectively rate the social, occupational and psychological functioning of adults, Dr. Schmitt determined that Plaintiff had some serious symptoms or any serious impairments in social, occupational or school functioning. Dr. Schmitt's opined that medications were indicated so he prescribed a trial of Effexor XR®, an extended-release capsule used to treat major depressive disorder (Tr. 171-172; www.globalassessmentoffunctioning).

4.    DR. FREDERICK G. LEIDAL, PHD, PSY. D.

Plaintiff underwent a comprehensive psychological examination on March 10, 2006 during which Dr. Leidal administered the WECHSLER ADULT INTELLIGENCE SCALE–THIRD EDITION (WAIS-III), the MINNESOTA MULTIPHASIC PERSONALITY INVENTORY-2 (MMPI-2), the WIDE RANGE ACHIEVEMENT TEST-THIRD EDITION (WRAT-III), the PEABODY INDIVIDUAL ACHIEVEMENT TEST-REVISED (PIAT-R); and the READING COMPREHENSION TEST and the VOCATIONAL PROJECTIONS TEST (Tr. 306).

- Results from the WAIS-III showed a low estimate of Plaintiff's cognitive ability at the time he took the test due to high levels of anxiety and early sub-test termination (Tr. 309). Generally, the test results suggested that Plaintiff's intellectual functioning was in the average range of intelligence. His verbal performance sub-test used to determine lateralized

13

signs of a cerebral dysfunction were remarkable, showing high levels of anxiety (Tr. 309)
Test results showed that Plaintiff's psychoeducational skills were within the average
range.  These results appeared to be valid (Tr. 310).

- Plaintiff's scores on the personality and behavioral assessment component of the MMPI
  showed a patient who needed to be viewed by others as normal and negative emotions and
  psychological problems were likely to be avoided or denied.  The elevated scale 2 of the
  MMPI suggested evidence of depressive symptoms.  The elevated scales 3 and 4 were
  indicative of an angry and markedly egocentric individual (Tr. 311).

- Plaintiff's scores on the PIAT and WRAT showed psychoeducational skills in the average
  range for reading recognition and spelling.  The written math and reading comprehension
  scores were below the average range (Tr. 310-311).

- Dr. Leidal diagnosed Plaintiff with a dysthymic disorder, a chronic type of depression, and
  a personality disorder, not otherwise specified.  He found that Plaintiff had conditions that
  may impact his emotions, specifically, obesity, hypertension and breathing problems.  He
  assessed Plaintiff's global assessment of functioning as indicative of moderate symptoms
  or moderate difficulty in social, occupational and school functioning (Tr. 313;
  www.ncbi.nlm.nih.gov).

**5      DR. JOHN WADDELL.**

On May 16, 2006, Dr. Waddell conducted a review of the medical summary and determined
that Plaintiff had a medically determinable impairment present, namely depression not otherwise
specified, and anxiety, not otherwise specified.  In the PSYCHIATRIC REVIEW TECHNIQUE form, Dr.
Waddell opined that the degree of functional limitations caused by Plaintiff's impairments on his
restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in
maintaining concentration, persistence or pace, was mild.  No deterioration of a previously working
structure or system was noted (Tr. 324-328).

**6      PORTAGE PATH.**

Plaintiff presented to Portage Path regularly for medication management, mental health
treatment and/or counseling services.  Notably, on:

- August 4, 2006, Plaintiff participated in group psychotherapy and the group concentrated

14

on method of employing positive thoughts into behaviors (Tr. 354).

• August 16, 2006, Plaintiff addressed coping skills during counseling/psychotherapy (Tr. 352).

• August 21, 2006, Plaintiff participated in group psychotherapy and the group concentrated on positive thinking (Tr. 353).

• September 1, 2006, Plaintiff participated in group counseling with an emphasis on managing stress.

• September 18, 2006, Plaintiff had symptoms of anxiousness but he reported sleeping eight hours per night, his appetite was okay and he had no visual hallucinations.  He did find it difficult to concentrate.  During group psychotherapy, Plaintiff reviewed with other participants his need to belong (Tr. 346, 351).

• October 6, 2006, Plaintiff participated in group therapy which addressed ways to identify self-defeating behaviors (Tr. 348).

• November 3, 2006, Plaintiff underwent one hour of counseling to address familial and financial stressors (Tr. 346).

• January 9, 2007, Plaintiff was sleeping well, his appetite was good and he was physically active.  There were no signs of auditory or visual hallucinations, drug, alcohol or nicotine abuse (Tr. 344).

• February 16, 2007, Plaintiff was stable and coping "okay" (Tr. 415).

• April 26, 2007, Plaintiff was coping "okay" (Tr. 413).

• June 13, 2007, Plaintiff underwent counseling/psychotherapy to address financial stressors. He mentioned that he was feeling overwhelmed at work in a club;  he was sleeping well, and his appetite was good (Tr. 411).

• July 18, 2007, Plaintiff was counseled on coping with the stress of the summer.  His electrocardiography was normal (Tr. 409, 410).

• January 3, 2008, Plaintiff was diagnosed with mild major depressive disorder, intermittent explosion (Tr. 403).

• February 13, 2008, the dosage of Effexor XR® was increased (Tr. 401).

• March 5, 2008, Plaintiff reported that despite his sleep and anxiety problems, he was going to complete his degree in the Fall of 2008 (Tr. 399).

15

- April 16, 2008, Plaintiff reported having a problem with falling asleep.  He was started on a trial of Provigil, a medication used to treat excessive sleepiness caused by narcolepsy.  In addition, he underwent counseling to address coping skills (Tr. 396, 397; www. nlm.nih.gov).

- May 20, 2008, Plaintiff was doing well with Effexor as prescribed.  His affect and mood were appropriate and his thoughts were lucid (Tr. 394).

- June 11, 2008, Plaintiff underwent counseling/psychotherapy.  He reported that he was interested in obtaining part-time employment and he was able to discuss the importance of coping skills (Tr. 393).

- June 12, 2008, Plaintiff noted that "dropping Lexapro" was a good idea; he was not as tired or anxious (Tr. 392).

- August 19, 2008, Plaintiff was doing "rather well" and pleased with his progress (Tr. 390).

- October 23, 2008, Plaintiff's mood was stable and his medications were continued (Tr. 387, 443-444).

- January 20, 2009, Plaintiff's mood was depressed.  He attributed it to a seasonal affective disorder (Tr. 441).

- April 14, 2009, Plaintiff presented for a medication check.  The dosage of Effexor was decreased and the prescription for Adderall was continued (T. 440).

### VI. Physical Medical treatment evidence.

Plaintiff complained of a myriad of symptoms related to cervical disk problems, persistent muscular pain, heart palpitations and a loss of sensation in two fingers.  He attributed the cervical disc impairments to a history of heavy lifting.

### 1.    The Houston Cardiac Association.

The Texas Rehabilitation Commission ordered a special examination because the available records were insufficient and additional records were needed to complete his evaluation for disability.  Accordingly, Dr. Baxter D. Montgomery, MD., FACC, a cardiologist, examined Plaintiff on August 6, 2003.  Plaintiff complained of dizziness and low level energy.  Dr. Montgomery determined that Plaintiff had a history of uncontrolled hypertensive heart disease, dizziness and shortness of breath with

exertion (Tr. 129-130; STEDMAN'S MEDICAL DICTIONARY 122310 (27th ed. 2000)).

Dr. Montgomery ordered advanced diagnostics.  The results from tests administered on August

7, 2003, were:

- Clinical indications showed no evidence of focal pulmonary process (Tr. 132).
- Results from an electrocardiogram showed normal sinus rhythm with minimal voltage criteria for left ventricular hypertrophy.
- Results from the echocardiogram showed normal measurements in the cardiac chambers, left ventricle showed normal systolic and diastolic function, the mitral valve showed normal trivial regurgitation, the tricuspid valve showed trivial regurgitation, the aortic valve is normal and there was no evidence of pericardial effusion (Tr. 141-144).

**2.    DR. TERRY COLLIER, M. D., ENDOCRINOLOGIST.**

On August 27, 2003, Dr. Collier determined that based on the primary diagnosis of uncontrolled

hypertension, Plaintiff could:

- Occasionally lift and/or carry twenty pounds;
- Frequently lift and/or carry ten pounds;
- Stand and/or walk about six hours in an eight-hour workday and unlimited pushing and/or pulling; and
- Never climb using a ladder/rope/ scaffold (Tr. 133-140).

**3.    JUNEAU URGENT CARE AND FAMILY MEDICAL CLINIC.**

While residing in Juneau, Alaska, Plaintiff was treated by various physicians to primarily

sustain drug therapy:

- December 18, 2003, Plaintiff presented to obtain refills of Mavik, a medication used to treat high blood pressure and Valium, a medication used to relieve anxiety (Tr. 156-1587; www.nlm.hin.gov).

- December 26, 2003, Plaintiff underwent blood work for an update on hyperlipidemia.  The results showed triglycerides, cholesterol and alanine aminotransferase levels exceeded the normal limits.  Also, the attending physician addressed complaints of insomnia (Tr. 152, 155).

- December 26, 2003, Plaintiff underwent a molectomy.  Three skin tags were removed (Tr. 154).

- January 17, 2004, Plaintiff's medications were changed.  The dosage of Atacand, a

medication used alone or in combination to treat hypertension, was increased; Lipitor, a cholesterol reducing agent, and Ambien, a medication prescribed to treat chronic insomnia, were prescribed (Tr. 145-147; www.nlm.nih.gov; PHYSICIAN'S DESK REFERENCE, 2005 WL 4061897, 2005 WL 4061605 (Thomson PDR 2005).

• January 20, 2004, Plaintiff underwent an excisional biopsy of a benign overgrowth on the left eye.  The excised tissue was sent to pathology for evaluation (Tr. 151).

**4.  AKRON HEALTH DEPARTMENT/AKRON HEALTH DEPARTMENT LABORATORY.**

After moving from Alaska to Ohio, Plaintiff entered a program to obtain medications previously prescribed to control blood pressure and reduce cholesterol.  His course of treatment included:

• March 2, 2005, Plaintiff presented with a request for medications.  His systolic blood pressure was 172 and his diastolic blood pressure was 108 (Tr. 161, 166).

• March 17, 2005, laboratory results showed an elevated ratio of blood urea nitrogen and serum creatinine, a component of urine and final product of creatine catabolism and alanine aminotransferases.  His systolic blood pressure was 148 and his diastolic blood pressure was 92 (Tr. 164; STEDMAN'S MEDICAL DICTIONARY 17560, 57890, 94270 (27th ed. 2000)).

• March 18, 2005, laboratory results showed elevated triglycerides (Tr. 163).

• March 24, 2005, Plaintiff complained of daytime sleepiness which was getting progressively worse (Tr. 161).

• June 9, 2005, Plaintiff's blood pressure was uncontrolled but much improved.  His systolic blood pressure was 142 and his diastolic blood pressure was 80 (Tr. 160, 166).

• July 28, 2005, Plaintiff presented with a request for medications.  The prescription for Effexor and blood pressure medications were continued (Tr. 175).

**5.  DR. TODD A. LISY, M. D., AN INTERNAL MEDICINE SPECIALIST.**

Dr. Lisy prescribed a treatment regimen designed to control Plaintiff's blood pressure and cholesterol.  Plaintiff presented on these dates for examination:

• September 23, 2005, Plaintiff had a benign lesion on his eyelid that was progressively getting larger.  In addition, medication to control the symptoms of hypertension and depression were prescribed.  Plaintiff's blood pressure measured 140 over 88 (Tr. 301, 302).
• September 29, 2005, Plaintiff reported having difficulty sleeping.  His blood pressure was 126 over 82 (Tr. 299, 300).

18

- November 3, 2005, Plaintiff's blood pressure was 124 over 80.  Blood work was ordered to assess other systems affected by blood pressure (Tr. 297, 298).

- January 9, 2006, Plaintiff presented with cough, congestion, rhinitis and wheezing.  His blood pressure was elevated (Tr. 295).

- February 20, 2006, Plaintiff's lipid profile was elevated.  His blood pressure was stable (Tr. 293).

- June 20, 2006, Plaintiff's lipid profile was elevated.  His blood pressure was stable (Tr. 331, 332).

- September 11, 2006, Dr. Lisy opined in a MEDICAL SOURCE STATEMENT, a statement from a health care professional regarding medical health impairments and their impact on functional activities, that because Plaintiff had herniated nucleus pulposus symptoms, he could only:  lift/carry eight pounds, stand and walk 3/4 hours in an eight-hour day without interruption, sit 3/4 hour in an eight-hour workday without interruption, use a sit/stand option, rarely climb, balance, stoop, crouch, kneel, crawl, and occasionally reach, handle, feel push/pull, engage in fine manipulation and gross manipulation (Tr. 338-339).

- June 19, 2007, Plaintiff's medications were adjusted by his psychiatrist; he had been anxious and his heart had been racing since his psychiatrist implemented the change.  Dr. Lisy prescribed Valium to resolve feelings of anxiety (Tr. 367, 368).

- July 9, 2007, Dr. Lisy continued the drug therapy, created to control benign hypertension, hyperlipidemia and depression with anxiety (Tr. 364-365).

- October 8, 2007, Plaintiff's blood pressure was controlled and he denied chest pain or shortness of breath.  There was leg edema and fatigue.  Dr. Lisy suggested a diet regimen to control Plaintiff's hyperlipidemia (Tr. 362).

- March 19, 2008, Dr. Lisy updated the MEDICAL SOURCE STATEMENT, reiterating his previous findings that Plaintiff could lift/carry eight pounds, stand and walk 3/4 hours in an eight-hour day without interruption, sit 3/4 hour in an eight-hour workday without interruption, use a sit/stand option, rarely climb, balance, stoop, crouch, kneel, crawl, and occasionally reach, handle, feel push/pull, engage in fine manipulation and gross manipulation (Tr. 380-381).

- December 2, 2008, Plaintiff explained that his blood spiked when he was under emotional distress.  Treatment persisted for hyperlipidemia, depressive disorder, and allergic rhinitis, not otherwise specified  (Tr. 431-433).

- March 13, 2009, Dr. Lisy prescribed Naprosyn, a medication used to relieve pain, swelling and stiffness, to relieve Plaintiff's backache, not otherwise specified (Tr. 429, www.nlm.nih.gov).

### VII. STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her

20

past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

### VIII. JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g). The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)). The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . *Id.* This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### IX. ANALYSIS.

Plaintiff presents two issues for judicial review. First, the ALJ from this hearing erred by failing to credit the residual functional capacity determination made by the ALJ in the first hearing. In response, Defendant argues that the substantial evidence supports ALJ Carissimi's residual functional capacity decision.

Second, Plaintiff challenges the ALJ's failure to give deferential treatment to the opinions of Drs. Lisy and Scozzaro. In response, Defendant argues that the ALJ did assess the weight given these physicians' opinions and the appropriation of weight was appropriate for the medical source.

### 1. DID THE ALJ COMMIT LEGAL ERROR BY FINDING THAT PLAINTIFF CAN PERFORM A RANGE OF MEDIUM WORK?

ALJ Lazarro determined that Plaintiff was capable of performing light work. ALJ Carissimi acknowledged that ALJ Lazarro made such a determination. ALJ Carissimi also found that there was substantial and material evidence of improvement regarding Plaintiff's medical conditions. Accordingly, ALJ Carissimi re-evaluated the medical evidence and concluded that Plaintiff was capable of performing medium work.

Plaintiff concedes that evidence of improvement is probative, but it is not conclusive of medical improvement or that Plaintiff's residual functional capacity has increased beyond light work. Plaintiff directs the Court's attention to *Dennard v. Secretary*, 907 F. 2d 598 (1990) and argues that the prior determination should prevent the Commissioner from reevaluating evidence on a resolved issue in a subsequent hearing. Plaintiff suggests that ALJ Carissimi erroneously rejected ALJ Lazarro's finding that he was restricted to light work and that he had undergone medical improvement.

Defendant explained that the Social Security Administration's (SSA) policy on *res judicata* embodies these principles: where SSA has already decided whether a claimant is disabled during a specific period of time, SSA ordinarily does not re-adjudicate that same claim (i.e., whether the

22

claimant was disabled during the period previously considered) if it is raised again in a new application under the same title of the Social Security Act; but when considering whether a claimant is disabled during a period of time that has not previously been adjudicated, SSA considers the facts and issues de novo and does not give preclusive effect to findings made in earlier decisions.  Absent evidence of improvement or changed circumstances, the Court concluded that the ALJ was bound by the prior findings pursuant to principles of *res judicata*.

The court in *Dennard* clearly established that where the Commissioner in a decision on an initial application for benefits, determined that disability claimant could not perform his past relevant work, the ALJ was precluded by estoppel from reconsidering the issue to find that claimant could perform this work.  *Id.* at 600.  The case was remanded to the court to resolve a narrow issue of whether Dennard was disabled in light of the prior determination that he could return to his previous employment.  *Id*.  However, in *Drummond v. Commissioner*, 126 F. 3d 837 (6th Cir. 1997), the court expanded the extent and scope of the bar on re-litigation.  Essentially, the basic principles were the same.  The adjudicator of a subsequent claim must adopt and be bound by the finding of a claimant's residual functional capacity or other findings required at a step in the sequential evaluation process. *Id.*  The ALJ in the subsequently filed claim could not reexamine or redetermine the finding of a claimant's residual functional capacity or other issues previously determined **in the absence of new and additional material evidence or changed circumstances**. *Id.*  The court explained that principles of *res judicata* applied in an administrative law context following a trial type hearing and that the second ALJ was bound to the sedentary residual-functional-capacity determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition.  *Id*. at 840, 842.  "Just as a social security claimant is barred from re-litigating an issue that has been previously determined, so is the Commissioner."  *Id*.

23

The Magistrate notes that if ALJ Carissimi had given deference to ALJ Lazzaro's finding of a residual functional capacity suitable for light work, such determination would not have changed the outcome of the disability determination.  At the time of application in 2006, Plaintiff was closely approaching advanced age, had a high school education or more and he had transferable skills.  Using the Medical-Vocational Guidelines (the Grid), as a framework, a finding of not disabled would ensue. Nevertheless, the Magistrate finds that ALJ Carissimi considered the *Dennard* and *Drummond*-style bar to re-litigation.  ALJ Carissimi explained that he considered ALJ Lazzaro's decision and material evidence that since October 28, 2005, Plaintiff's conditions had improved.

The Magistrate finds significant evidence in the record to support ALJ Carissimi's reevaluation of Plaintiff's residual functional capacity.  After the first hearing, Plaintiff became a matriculating student pursuing a University of Akron degree.  His grade point average reflected a superior student. A review of the medical records provided by Dr. Schmitt offered nothing by way of improvement as his evaluation occurred before ALJ made his decision on October 28, 2005 (Tr. 171-172).  Notably, Dr. Scozzaro found on March 13, 2006, that Plaintiff suffered from mild to moderate depression and anxiety, he had no major deficits in cognitive functioning and an average ability to remember, understand, follow directions, maintain attention; and to sustain concentration, persist at tasks (Tr. 318-319).  Later in March 2008, Dr. Scozzaro found that Plaintiff had a poor or no useful ability to (1) function in a competitive setting as it related to dealing with work stresses; (2) complete a normal workday without interruptions for psychologically based symptoms; and (3) leave home on his own (Tr. 370, 377-378).

Dr. Leidal's evaluation acknowledged that on March 10, 2006, Plaintiff was experiencing high levels of anxiety, his psychoeducational skills were within the average range, he was angry and markedly egocentric, he needed to be viewed as normal individual and that Plaintiff's medical

24

conditions affected his emotions (Tr. 309, 310, 311, 313).  Dr. Waddell conducted a review of the medical summary and determined that Plaintiff had a medically determinable impairment present, namely depression not otherwise specified, and anxiety, not otherwise specified but the degree of functional limitations caused by Plaintiff's impairments was mild and Plaintiff had not suffered deterioration of a previously working structure or system was noted (Tr. 324-328).

Generally, Plaintiff's symptoms of depression and anxiety responded well to medication.  At Portage Path, Plaintiff presented regularly for medication management, participation in group therapy and for individual counseling.  Although he experienced problems with narcolepsy, occasional feelings of being overwhelmed and seasonal depression, overall Plaintiff performed well and his mood was stable so long as he complied with the medication regimen (Tr. 344, 346, 348, 351-354, 387, 390, 392-394, 394, 399, 401-403, 409, 410, 411, 413, 415, 413, 440, 441, 443-444).

Plaintiff has not shown significant deterioration in his mental impairment since October 28, 2005, when he was determined not to be disabled.  Based on a review of this medical evidence, there is substantial evidence from which the ALJ could reasonably conclude that Plaintiff's condition was substantially stabilized after the first administrative hearing on October 28, 2005.

Dr. Lisy is the only physician who can provide evidence about the scope of Plaintiff's physical condition after October 28, 2005.  His medical records show that on November 3, 2005, Plaintiff's blood pressure was within normal range (Tr. 297, 298).  Plaintiff blood pressure was elevated on January 9, 2006 because he had a cough along with congestion and rhinitis (Tr. 295).  On February 20, 2006, Plaintiff's lipid profile was elevated but his blood pressure was stable (Tr. 293).  On June 20, 2006, Plaintiff's lipid profile was elevated but his blood pressure was stable (Tr. 331, 332).  Dr. Lisy continued the drug therapy and on June 9, 2007, Plaintiff's hypertension and hyperlipidemia were apparently stable (Tr. 364-365).  Dr. Lisy found Plaintiff's blood pressure stable on October 8, 2007.

25

There was no chest pain or shortness of breath (Tr. 362). Plaintiff's blood pressure spiked on December 2, 2008 because he was emotionally distraught and treatment for hyperlipidemia and hypertension continued (Tr. 431-433).

Based on this review of evidence, the Magistrate finds that the *Drummond* paradigm does not bar re-litigation when, in this case, Plaintiff's physical impairments also improved after ALJ Lazzaro rendered his decision. Once ALJ Carissimi determined that Plaintiff's physical impairments had either stabilized or improved with treatment, it was within his province to consider the improvement as it related to Plaintiff's condition. The reevaluation of Plaintiff's physical impairment rendered different results which are supported by substantial and material evidence. This finding cannot be disturbed.

### 2. DID THE ALJ ERR IN FAILING TO ATTRIBUTE APPROPRIATE WEIGHT TO THE OPINIONS OF DRS. LISY AND SCOZZARO?

At issue in this case is the weight given to Plaintiff's two treating sources. Plaintiff claims that the ALJ's decision lacks an analysis of the weight given such opinions or an analysis of why such opinions were not attributed significant weight.

To judge compliance with the treating source rule, the Magistrate must first determine whether Drs. Lisy or Scozzaro are treating sources. As defined in the Act, a treating source:

> . . . means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C. F. R. § 404.1502 (Thomson Reuters 2012).

The Commissioner has elected to impose certain standards on the treatment of medical source evidence.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502).  Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."  *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).

The Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* (*citing* SOC. SEC. RUL. No. 96–2p, 1996 SSR LEXIS 9, at *12 (July 2, 1996)).  This requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  *Id.*  It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not."  *Id.* at 937-938 (*citing Wilson*, *supra*, 378 F.3d at 544).

27

Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule." *Id*. (*citing Wilson*, at 544–545).

Although the ALJ's analysis is succinct, the Magistrate can conduct meaningful review of the ALJ's application of the treating physician rule to Dr. Lisy's opinions.  The ALJ did not label Dr. Lisy as a treating physician since he was unable to provide a longitudinal look at Plaintiff's impairments.  The ALJ discounted Dr. Lisy's opinions because once Plaintiff's blood pressure was controlled, the nature of Dr. Lisy's treatment was limited to removing a lesion from Plaintiff's eye, resolving cold/flu symptoms, prescribing a sleep aid and pain medication and monitoring Plaintiff's ongoing medicinal regimen.  The ALJ noted that contact with Dr. Lisy was sporadic, occasionally interrupted by months before a medicinal treatment necessity arose.  The frequency was inconsistent with treatment and/or evaluation required for a more severe medical condition.  More importantly, Dr. Lisy made a finding that Plaintiff had a herniated nucleus pulpous but failed to support this finding with medically acceptable clinical and laboratory diagnostic techniques.  Because Dr. Lisy's opinions were not supported by diagnostic evidence, the ALJ suggested  that Dr. Lisy exaggerated the severity of Plaintiff's limitations to support a finding of moderately severe functional limitations.  It is clear why the ALJ acknowledged but discounted Dr. Lisy's opinions (Tr. 28).

The ALJ attributed limited weight to Dr. Scozzaro's opinions for similar reasons.  Acknowledging that Dr. Scozzaro had a treating relationship that lasted approximately eight months, the ALJ found that the record was not supplemented with treatment notes or diagnostic tests.  Even so, Dr. Scozzaro's summation of Plaintiff's impairment suggested that it was mild, that he had no major deficits in cognitive functioning and that he had an average ability to remember, understand and follow directions, maintain attention and sustain concentration, persistence and pace (Tr. 318-319).  Two years

28

after the treatment relationship concluded, Dr. Scozzaro rated Plaintiff's ability to perform the following basic mental activities on a sustained basis.  The ALJ was not persuaded that there was supportability of the opinion or that it was consistent with the record as a whole.  Since the ALJ followed the rules, applied the legal standard and supplied support for his findings of fact, the decision to attribute little weight to Dr. Scozzaro's opinion is conclusive.

## X. CONCLUSION.

For these reasons, the Commissioner's decision denying SSI and DIB benefits is affirmed and the case is dismissed.

**IT IS SO ORDERED**.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:    September 6, 2012

29